# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:23-cv-00192-MR

| | |
|---|---|
| PATRICK ALAN GILCHER,       ) | |
|       ) | |
|           **Plaintiff,**      ) | |
|       ) | |
|      **vs.**      ) | |
|       ) | |
| RYAN SMITH, in his individual and  ) | |
| official capacities; BILLY OLVERA, in ) | |
| his individual and official capacities; ) | **ORDER** |
| BRENT HOLBROOKS, in his official  ) | |
| capacity as Sheriff of Macon County; ) | |
| ROBERT HOLLAND, in his official   ) | |
| capacity as former Sheriff of Macon ) | |
| County; and WESTERN SURETY    ) | |
| COMPANY, as surety for the Sheriff  ) | |
| of Macon County,      ) | |
|       ) | |
|           **Defendants.**   ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment. [Doc. 16].

## I.     PROCEDURAL BACKGROUND

On August 1, 2023, the Plaintiff Patrick Alan Gilcher (the "Plaintiff")[1]

filed a Complaint against the Defendants Brent Holbrooks, in his official

_____

[1]Taryn Gilcher, the Plaintiff's wife, was also named as a party plaintiff [Doc. 1 at 1] but was subsequently dismissed voluntarily [Doc. 11].

capacity as the current Sheriff of Macon County; Robert Holland, in his official capacity as the former Sheriff of Macon County; Ryan Smith, in his individual and official capacity; Billy Olvera, in his individual and official capacity; and Western Surety Company, as surety for the Sheriff of Macon County (collectively, the "Defendants"). [Doc. 1 at 1].

In his Complaint, the Plaintiff asserts claims under 42 U.S.C. § 1983 against Defendants Olvera and Smith for excessive force, in violation of the Fourteenth Amendment, and for cruel and unusual punishment, in violation of the Eighth Amendment, and against Defendants Holland and Holbrooks for failure to train, in violation of the Fourteenth Amendment. [Id. at 12–15]. The Plaintiff also asserts state law claims of common law battery against Defendants Olvera and Smith, and an action on the Macon County Sheriff's bond with respect to Defendants Holland, Smith, and Olvera. [Id. at 15–19]. On October 2, 2023, the Defendants filed an Answer. [Doc. 5].

On September 16, 2024, the Defendants filed a Motion for Summary Judgment regarding all of the Plaintiff's claims. [Doc. 16 at 2]. On October 8, 2024, the Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment. [Doc. 23]. On October 22, 2024, the Defendants filed a Reply to the Plaintiff's Response. [Doc. 27]. This matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a summary judgment motion with citation to "depositions,

3

documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(A). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, a court may only consider material that can be reduced to admissible evidence. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citing Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991)); see also Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

When ruling on a summary judgment motion, a court must view the evidence and any inferences therefrom in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> when the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for

4

the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Id. (citations, alterations, and quotation marks omitted).

## III. FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

On September 4, 2021, Trey Chastain ("Officer Chastain"), then a police officer for Franklin, North Carolina, responded to a disturbance call from an RV park in Franklin. [Doc. 16-1: Chastain Decl. at ¶¶ 4–5]. Prior to Officer Chastain's arrival, the RV park manager had choked the Plaintiff and thrown him to the ground. [Doc. 24-3: Plaintiff Dep. at 15]. After interviewing witnesses on the scene, Officer Chastain arrested the Plaintiff, who appeared to be intoxicated. [Doc. 16-1: Chastain Decl. at ¶ 5; Doc. 17-2: Chastain Dep. at 4]. Officer Chastain then transported the Plaintiff to the Macon County Detention Center (the "Detention Center"). [Doc. 17-2: Chastain Dep. at 2; Doc. 18: Olvera Decl. at ¶ 5].

5

Defendants Olvera and Smith were working at the Detention Center as detention officers when the Plaintiff arrived at about 4:30 a.m. [Doc. 18: Olvera Decl. at ¶ 5; Doc. 16-2: Smith Decl. at ¶ 7].[2] The Plaintiff appeared to be intoxicated when he entered the Detention Center. [Doc. 18: Olvera Decl. at ¶ 6]. The Plaintiff was physically cooperative but verbally uncooperative with Defendants Olvera and Smith. [Doc. 24-6: Smith Dep. at 9]. Defendant Smith thought the Plaintiff was being "annoying," but the Plaintiff never threatened anyone. [Id. at 9–11].

At about 4:38 a.m., Defendants Olvera and Smith placed the Plaintiff into cell 239, and immediately upon entering the cell, the Plaintiff struck the cell door. [Doc. 18: Olvera Decl. at ¶ 6; Video One at 4:01–4:04; Doc. 24-3: Plaintiff Dep. at 5–6].[3] Immediately after the Plaintiff struck the door, about three seconds after the Plaintiff entered cell 239, Defendant Smith opened the cell door, aimed his taser at the Plaintiff, ordered the Plaintiff to get on

---

[2]Detention Center cameras recorded portions of the Plaintiff's time at the Detention Center. The recordings are on two videos: one displaying the Detention Center's booking area ("Video One") and one displaying the inside of cell 238, the Plaintiff's second cell location ("Video Two"). There appears to be about a six-minute disparity between the time stamps in Video One and Video Two. This disparity, however, is immaterial.

[3]The number ranges within the video citations indicate the location of the relevant portion of the video, not the standard time in North Carolina on September 4, 2021. For example, the "4:01" mark of Video One is the first second of the fourth minute of Video One, which shows footage of the Detention Center at 4:38 a.m. on September 4, 2021.

6

the ground, and handcuffed the Plaintiff's hands behind his back. [Doc. 17-6: Smith Dep. at 2; Video One at 4:04–5:37]. Defendant Smith testified that he had warned the Plaintiff against hitting the door, but Defendant Smith did not include any such warning in his written incident report. [Doc. 24-6: Smith Dep. at 12].

After handcuffing the Plaintiff, Defendant Smith checked to see if the Plaintiff's handcuffs were too tight. [Doc. 17-6: Smith Dep. at 2; Doc. 18: Olvera Decl. at ¶ 6]. Defendants Olvera and Smith then placed the Plaintiff in a "restraint chair," a chair with straps that prevent the occupant from moving. [Doc. 17-6: Smith Dep. at 3; Video One at 5:46]. The officers placed the Plaintiff in the restraint chair for his own safety, as well as the safety of others. [Doc. 18: Olvera Decl. at ¶ 6; Doc. 24-5: Olvera Dep. at 16]. Defendant Olvera stated that putting the Plaintiff into the restraint chair was necessary because "hitting [the door] repeatedly could result in injury." [Doc. 24-5: Olvera Dep. at 16]. Defendants Olvera and Smith then put the Plaintiff, who remained in the restraint chair, into cell 238. [Doc. 17-6: Smith Dep. at 3; Video One at 8:21].

The Plaintiff testified that he did not remember anyone checking on his "well-being" while he was in the restraint chair. [Doc. 24-3: Plaintiff Dep. at 25–26]. According to the Plaintiff, while he was in the restraint chair, he

pleaded for medical help and for the detention officers to loosen his handcuffs, but the detention officers verbally antagonized him, rather than helping him. [Id.]. The Plaintiff testified that the detention officers told him to "quit being a baby," and that his time in the restraint chair would restart every time he "whimper[ed]." [Id.]. Defendant Smith testified, on the other hand, that during his shift, the Plaintiff was continuously monitored during pursuant to Detention Center policy. [Doc. 16-2: Smith Decl. at ¶ 8]. According to Defendant Smith, this monitoring included allowing the Plaintiff to stand, checking the Plaintiff's handcuffs to ensure they were not too tight, and asking the Plaintiff if he wanted water. [Id.].

The video evidence shows that at around 5:14 a.m., Defendants Olvera and Smith removed the Plaintiff from cell 238. [Video Two at 23:03–23:21]. Defendants Smith testified that he and Defendant Olvera then checked the Plaintiff's restraint straps and handcuffs to ensure they were not too tight before returning him to his cell.[4] [Doc. 17-6: Smith Dep. at 3]. At about 5:54 a.m., an unidentified male detention officer and an unidentified man in plain clothes entered cell 238. [Video Two at 48:04]. The two men

_____

[4]The video evidence shows that the Plaintiff was removed from cell 238, but the video evidence does not show whether Defendants Olvera and Smith checked the Plaintiff's restraint straps or handcuffs. [Video Two at 23:03–23:21].

spoke to the Plaintiff for about three minutes, and the man in plain clothes took notes.  [Id. at 48:04–50:49].

Both Defendant Olvera's and Smith's shifts ended at 6:00 a.m.  [Doc. 18: Olvera Decl. at ¶ 7; Doc. 16-2: Smith Decl. at ¶ 9].  At the end of their shifts, both Defendants Olvera and Smith left the Detention Center, and the Plaintiff remained in the restraint chair in cell 238.  [Doc. 18: Olvera Decl. at ¶ 7; Doc. 16-2: Smith Decl. at ¶ 9].  At about 6:07 a.m., an unidentified male detention officer entered cell 238 and spoke to the Plaintiff for about one minute.  [Video Two at 1:00:52–1:01:51].  At about 6:12 a.m., detention officers removed the Plaintiff from cell 238 and returned him to cell 238 about two minutes later.  [Id. at 1:05:10].[5]  At about 6:21 a.m., an unidentified female detention officer entered cell 238 and spoke to the Plaintiff for about thirty seconds.  [Id. at 1:11:42–1:12:09].  At about 6:31 a.m., an unidentified male detention officer and an unidentified female detention officer entered cell 238 and spoke with the Plaintiff for about twenty seconds.  [Id. at 1:20:49–1:21:07].

---

[5]There appears to be a "jump" in the time stamp between the time that the Plaintiff was removed from the cell and when he was returned.  The time stamp, which shows the standard time in North Carolina on September 4, 2021, reads "6:12:46" when the Plaintiff is removed, and it reads "6:14:41" when he is returned.  [Id. at 1:05:10–1:05:16].  The time that elapses from the recording during this period, however, is only about six seconds.  [Id.].  If there is any relevance to this, neither party has addressed it.

9

At about 7:34 a.m., detention officers removed the Plaintiff from the restraint chair and removed his handcuffs. [Id. at 2:00:39]. Detention officers then moved the Plaintiff into another cell until his grandfather picked him up on September 6, 2021. [Doc. 17-7: Plaintiff Dep. at 4–8]. That same day, the Plaintiff went to Angel Medical Center (the "Hospital"). [Id.; Doc. 17-8]. The Hospital recorded the Plaintiff's visit on a registration form (the "Form"). [Docs. 17-8, 24-18]. The Form states that the Plaintiff complained of "neck pain with low back pain, right wrist and hand pain/tingling and a small lump over [a] previous surgical site that occurred after an alleged assault." [Doc. 24-18 at 4]. The Form states that the Plaintiff "was picked up and body slammed on Friday night." [Id.]. The Form does not include any complaint by the Plaintiff that he was harmed by handcuffs or other restraints at the Detention Center. [Id.]. The Plaintiff testified, however, that he told a Hospital employee that he had been handcuffed "very tightly for several hours at the [Detention Center]." [Doc. 24-20: Plaintiff Decl. at 3].

Under the Plaintiff's "Diagnosis/Disposition," the Form lists the following: "1. Abdominal wall lump 2. Acute low back pain 3. Right wrist sprain 4. Sprain of right hand 5. Acute strain of neck muscle." [Id. at 5]. Under "Patient Instructions," the Form indicates that the Plaintiff was instructed to take "Tylenol and ibuprofen as needed for pain. Follow up with your surgeon

10

to address your potential abdominal wall hernia. Return to the emergency room if your symptoms change or worsen. Follow-up with primary care in 2 to 3 days for recheck." [Id.].

On September 16, 2021, the Plaintiff photographed his right hand and right wrist. [Doc. 24-21]. The photographs appear to show some minimal bruises and abrasions. [Id.]. About eighteen months later, on March 15, 2023 and May 31, 2023, Doctor Allen R. Blackburn, II saw the Plaintiff as a clinical patient. [Doc. 24-14: Blackburn Decl. at 3]. Doctor Blackburn is "a board-certified orthopedic hand, wrist, and elbow surgeon and fellowship-trained hand and upper extremity specialist." [Id. at 2]. Doctor Blackburn opined that the Plaintiff has "persistent neurological symptoms in his right wrist and hand, and that these symptoms represent a permanent impairment." [Id. at 4]. According to Doctor Blackburn, the Plaintiff has "a sensory deficit of 50% secondary to persistent pain and sensory deficit in the superficial terminal branches of the radial nerve." [Id. at 3]. Moreover, Doctor Blackburn opined "that a causal relationship existed between the use of metal handcuffs as a restraint on September 4, 2021, and [the Plaintiff's] persistent neurological symptoms, and that some degree of persistent sensory deficit is expected indefinitely consistent with permanent injury." [Id.].

11

## IV.    DISCUSSION

### A.    Cognizable Parties

As an initial matter, the Defendants argue that the Plaintiff's official capacity claims against Defendant Holland, the former Sheriff of Macon County, should be dismissed.    [Doc. 17 at 7].    Official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).    In official capacity claims, "the real party in interest is the entity," id. at 166, and the current office holder is the proper party, see Fed. R. Civ. P. 25(d).

By naming Defendants Holland and Holbrooks as defendants in their official capacities, the Plaintiff initiated "a suit against the entity," the Macon County Sheriff's Office.    See Graham, 473 U.S. at 166.    Defendant Holbrooks, the current Sheriff, is the proper party for this suit; Defendant Holland, the former Sheriff, is not. See Fed. R. Civ. P. 25(d).  Therefore, the Court dismisses the Plaintiff's claims against Defendant Holland.  Because Defendant Holbrooks is the proper party, even though this case concerns events that occurred during Defendant Holland's tenure, the Court will designate claims against Defendants Holbrooks simply as claims against the

"Macon County Sheriff."  See Fed. R. Civ. P. 17(d) (stating that a "public officer who sues or is sued in an official capacity may be designated by official title rather than by name").

The Defendants also argue that the Plaintiff's claims against Defendants Olvera and Smith in their official capacities should be dismissed because those claims are duplicative of the Plaintiff's official capacity claims against the Macon County Sheriff.  [Doc. 17 at 11–12].  As detailed above, official capacity claims against county officers are claims against the sheriff as the municipal entity, see Graham, 473 U.S. at 165–66, and courts can dismiss official capacity claims against county officers as redundant when the plaintiff also sues the sheriff, see Hogan v. Cherokee County, 519 F. Supp. 3d 263, 283 (W.D.N.C. 2021).  Accordingly, the Court dismisses the Plaintiff's claims against Defendants Olvera and Smith in their official capacities.  See id.

**B.    Section 1983**

The Plaintiff asserts § 1983 claims against Defendants Olvera and Smith for cruel and unusual punishment, in violation of the Eighth Amendment, and for excessive force, in violation of the Fourteenth Amendment.  [Doc. 1 at 12–14].  The Plaintiff also asserts a § 1983 claim against the Macon County Sheriff for failure to train, in violation of the

13

Fourteenth Amendment.  [Id. at 14–15].  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.    To prevail under § 1983, "the plaintiff has the burden of establishing (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law."  Hogan, 519 F. Supp. 3d at 276 (citing Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999)).

### 1.    Eighth Amendment Claim

The Eighth Amendment prohibits the government from inflicting "cruel and unusual punishments," U.S. Const. amend. VIII, but the Eighth Amendment does not apply to pretrial detainees, Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988).  It is undisputed that the Plaintiff was a pretrial detainee on September 4, 2021.  Therefore, the Eighth Amendment is inapplicable here, and the Court grants the Defendants summary judgment on the Plaintiff's Eighth Amendment claim.  See Fed. R. Civ. P. 56(a).

14

### 2. Fourteenth Amendment Claims

The Constitution has multiple provisions that prohibit the government from using excessive force. See U.S. Const. amends. IV, VIII, XIV. The applicable constitutional provision depends on the plaintiff's status in relation to the government. The Fourth Amendment applies to excessive force claims regarding persons who are arrested or otherwise "seized," Graham v. Connor, 490 U.S. 386, 388 (1989), the Eighth Amendment applies to excessive force claims regarding convicted criminals, Martin, 849 F.2d at 870, and the Fourteenth Amendment applies to excessive force claims regarding pretrial detainees, Kingsley v. Hendrickson, 576 U.S. 389, 396–97 (2015). The Plaintiff was a pretrial detainee on September 4, 2021, so the Fourteenth Amendment applies here. See id.

Excessive force analyses are similar, regardless of the applicable constitutional provision. See Rivas-Villegas v. Cortesluna, 595 U.S. 1, 6 (2021) (quoting Graham, 490 U.S. at 396) (stating that under the Fourth Amendment, "whether an officer has used excessive force depends on 'the facts and circumstances of each particular case'"); Kingsley, 576 U.S. at 397 (quoting Graham, 490 U.S. at 396) (stating that under the Fourteenth Amendment, excessive force turns on the "facts and circumstances of each particular case"); Hudson v. McMillian, 503 U.S. 1, 7 (1992) (stating that

15

under the Eighth Amendment, whether a prison guard has used excessive force depends on several factors).[6]  Indeed, the excessive force inquiry under the Fourth Amendment is identical to the excessive force inquiry under the Fourteenth Amendment.  Lombardo v. City of St. Louis, 141 S. Ct. 2239, 2241 n.2 (2021) (quoting Kingsley, 576 U.S. at 397).

In order to prove excessive force, a pretrial detainee must show that the force "used against him was objectively unreasonable."  Kingsley, 576 U.S. at 396–97.  Objective reasonableness "turns on the 'facts and circumstances of each particular case.'"  Id. at 397 (quoting Graham, 490 U.S. at 396). Courts must "account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security."  Id. (internal quotation marks omitted) (quoting Bell v. Wolfish, 441 U.S. 520, 540 (1979)).  In doing so, courts should consider:

---

[6]An Eighth Amendment excessive force claim differs because it "involves both an objective and a subjective component."  Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019).  Nonetheless, the objective component of an Eighth Amendment excessive force claim, like an excessive force claim under the Fourth or Fourteenth Amendment, depends on the facts and circumstances of each case.  See Hudson, 503 U.S. at 7.

16

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id.  De minimis injuries are not automatically dispositive of an excessive force claim.  See id.; see also Wilkins v. Gaddy, 559 U.S. 34, 39–40 (2010) (holding, in an Eighth Amendment case, that de minimis injury does not require "automatic dismissal of an excessive force claim").  Nevertheless, injury and force are correlated, and de minimis injuries can "provide some indication of the amount of force applied."  Wilkins, 559 U.S. at 37.

Handcuffing is "a standard procedure" in law enforcement, Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002), that "inevitably involves some use of force," Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006).  Thus, handcuffing, in and of itself, "rarely constitute[s] excessive force where the officers were justified" in applying the handcuffs.  Brown, 278 F.3d at 369. "Unduly tight handcuffing," however, can constitute excessive force if the plaintiff is injured from the handcuffing, and the defendant ignored the plaintiff's complaints about the handcuffs.  Karn v. PTS of Am., LLC, 590 F. Supp. 3d 780, 819–20 (D. Md. 2022) (denying summary judgment regarding the plaintiff's excessive force claim for overly tight handcuffs).  Like

17

handcuffing, "placement in a restraint chair 'does not in and of itself constitute an excessive use of force, as the use of devices such as restraint chairs . . . have repeatedly been found to be constitutional when used appropriately.'" Pugh v. Evans, No. 5:11-CT-3239-D, 2012 WL 6892816, at *3 (E.D.N.C. June 20, 2012) (quoting Rodriguez v. Taylor, No. 9:08–01027–RBH, 2008 WL 5244480, at *8 (D.S.C. Dec. 15, 2008)), aff'd, 475 F. App'x 934 (4th Cir. 2012).

Considering the need to preserve order in the Detention Center, it was not objectively unreasonable for Defendants Olvera and Smith to handcuff the Plaintiff and place him in a restraint chair for striking a cell door. See Kingsley, 576 U.S. at 396–97; Pugh, 2012 WL 6892816, at *3; Brown, 278 F.3d at 369. Therefore, Defendants Olvera and Smith did not use excessive force when they did so.

The Plaintiff claims that the handcuffs were too tight and that while he was in the restraint chair, he pleaded for medical help and for the detention officers to loosen his handcuffs, but the detention officers verbally antagonized him, rather than helping him.[7] [Doc. 24-3: Plaintiff Dep. at 25–

---

[7] The Plaintiff also testified that he did not remember anyone checking on his "well-being" while he was in the restraint chair. [Doc. 24-3: Plaintiff Dep. at 25–26]. The video evidence plainly shows multiple detention officers entering cell 238 and speaking with the Plaintiff while he was in the restraint chair. As such, the Court need not accept this portion

26].  The Plaintiff further testified that the detention officers told him to "quit being a baby," and that his time in the restraint chair would restart every time he "whimper[ed]."  [Id.].  Standing alone, antagonizing comments by the detention officers do not create a constitutional claim.  Morrison v. Martin, 755 F. Supp. 683, 687 (E.D.N.C. 1990) (quoting Coyle v. Hughs, 436 F. Supp. 591, 593 (W.D. Okla. 1977)) ("The law is clear that '[m]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.'"), aff'd, 917 F.2d 1302 (4th Cir. 1990).

Moreover, "[i]n a § 1983 action, the plaintiff must prove that the defendant's conduct was the proximate cause of a claimed injury."  Dillard v. Smith, 558 F. Supp. 3d 308, 311 (W.D. Va. 2021) (citing Kane v. Lewis, 604 F. App'x 229, 234 (4th Cir. 2015)).  "It is well-settled that expert testimony is 'not always necessary to establish causation' in cases involving the alleged use of excessive force."  Id. at 312 (quoting Zartner v. Miller, 760 F. App'x 558, 563 (10th Cir. 2019)).  Nonetheless, "when an injury lacks an obvious origin and multiple causes are possible, expert medical testimony is

of the Plaintiff's testimony because it "is blatantly contradicted by the record."  See Scott, 550 U.S. at 380.

necessary to prove causation between a use of force and an injury." Id. (quoting Zartner, 760 F. App'x at 563–64).

The Plaintiff asserts that he was injured by how tightly the handcuffs were applied. The Plaintiff's evidence from his visit to Angel Hospital on September 6th was that he had sprained his wrist and hand (among other serious complaints). The medical record, however, says nothing of any compression injury to the Plaintiff's wrist. Moreover, prior to his arrest the Plaintiff was in a physical altercation with the RV park manager, who choked the Plaintiff and threw him to the ground. The Plaintiff's complaints at the hospital correlate with injuries stemming from that altercation, but not with any injury caused by tight handcuffs.[8] As such, no reasonable jury could conclude from this evidence that the Defendants' application of the handcuffs caused such injury.

The only other piece of evidence the Plaintiff relies on is the declaration of a physician who treated the Plaintiff many months later, Doctor Blackburn. The doctor's causation opinion, however, lacks a sound medical or scientific methodology. See Fed. R. Evid. 702. His declaration does not describe the

_____

[8] In this respect, the present case is distinguishable from Karn v. PTS of America, 509 F.Supp.3d 780 (D. Md. 2022). In Karn, the plaintiff presented evidence of a clear physical manifestation of the excessively tight handcuffs for a much longer period of time than is found here.

"principles and methods" that he used to decide that the Plaintiff's injuries were caused by handcuffs, which were applied for approximately three hours, more than eighteen months prior to Doctor Blackburn examining the Plaintiff.  See id.  Rather, Doctor Blackburn infers that the Plaintiff's injuries were caused by handcuffs, as opposed to, for example, being body slammed at the RV park.  [Doc. 17-8 at 2].  Because Doctor Blackburn fails to explain how he derived this inference by "using scientific or other valid methods," his causation opinion is based merely "on belief or speculation."  See Nease v. Ford Motor Co., 848 F.3d 219, 229 (4th Cir. 2017) (quoting Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999)).  Accordingly, this causation opinion would be inadmissible at trial.  See Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Without an admissible expert opinion, the Plaintiff cannot prove causation between the Defendants' use of force and his injury.  See Dillard, 558 F. Supp. 3d at 312.

The Court is mindful that it must view the forecast of evidence and inferences therefrom in the light most favorable to the Plaintiff, but the Court is also mindful of the ultimate question at this stage: whether "a reasonable jury could return a verdict" for the Plaintiff.  See Anderson, 477 U.S. at 248.  Given that handcuffs and restraint chairs are standard law enforcement tools, see Brown, 278 F.3d at 369; Pugh, 2012 WL 6892816, at *3, and that

the Plaintiff's forecast of evidence establishes, at most, minimal injuries, without any admissible expert evidence to forecast how and when the injuries occurred, see Dillard, 558 F. Supp. 3d at 312, no reasonable jury could return a verdict for the Plaintiff regarding his excessive force claim. Accordingly, the Court grants the Defendants summary judgment as to the Plaintiff's § 1983 claim against Defendants Olvera and Smith for using excessive force. See Fed. R. Civ. P. 56(a).

A sheriff, as the final decision-maker for the county, can be held liable under § 1983 for failure to train, see City of Canton v. Harris, 489 U.S. 378, 387 (1989), but a sheriff cannot be held liable for failure to train "absent a finding of a constitutional violation on the part of the person being supervised," Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 724 (4th Cir. 1991) (quoting Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir.1990)). As the Court has concluded that the Plaintiff was not subjected to excessive force by Defendants Olvera and Smith, there can be no liability on the part of the Macon County Sheriff. See id. Therefore, the Court grants the Defendants summary judgment regarding the Plaintiff's § 1983 claim against the Macon County Sheriff for failure to train. See Fed. R. Civ. P. 56(a).

### C. State Law Claims

In a civil action over which a district court has original jurisdiction, a district court may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  A district court may also "decline to exercise supplemental jurisdiction" when it "has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c)(3).  Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).  Because the Court dismisses all of the Plaintiff's federal claims, it declines "to exercise jurisdiction over the remaining state-law claims."  See id.

### ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 16] is **GRANTED IN PART**, and the Plaintiff's federal claims are hereby **DISMISSED WITH PREJUDICE**.

23

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claims, which are hereby **DISMISSED WITHOUT PREJUDICE**.

The Clerk of Court is respectfully directed to close this civil case.

**IT IS SO ORDERED.**

Signed: December 13, 2024

Martin Reidinger
Chief United States District Judge

24